IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 24, 2015 Session

## JORDAN LEANNE (PARKER) ROLAND v. RYAN LEE ROLAND

**Appeal from the Chancery Court for Cheatham County**
**No. 16136      Robert E. Burch, Chancellor**

_____

**No. M2014-02032-COA-R3-CV – Filed September 29, 2015**
_____

Mother and Father are the parents of two minor children. Mother and Father each filed a complaint for divorce and sought to be named the primary residential parent. The trial court designated Father the primary residential parent and created a permanent parenting plan that was materially different from the plan proposed by either party. The court also entered a child support order. Mother appealed the trial court's judgment, arguing that the trial court erred by (1) designating Father the primary residential parent; (2) setting up the residential schedule and parenting plan based entirely on Father's work schedule, with the result that Mother has the children only one day at a time; and (3) imputing a higher income to her for child support purposes than is warranted by the evidence. We affirm the trial court's designation of Father as the primary residential parent, but we vacate the trial court's residential plan and child support order and remand the case to the trial court for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

Karla C. Miller, Nashville, Tennessee, for the appellant, Jordan Leanne Roland.

Irene R. Haude, Nashville, Tennessee, for the appellee, Ryan Lee Roland.

### OPINION

Jordan Leanne Roland ("Mother") and Ryan Lee Roland ("Father") were married in

2005.  They are the parents of Charlie and Rorie, who were born in 2004 and 2006, respectively.  Charlie's biological father died before Charlie was born, and Father adopted Charlie when he was three years old.  Mother and Father separated in 2011.

During their separation, Mother and Father took turns having the children stay with them for a week at a time.  Mother filed a complaint for divorce in March 2012, nearly a year following the parties' separation.  Mother alleged irreconcilable differences as grounds for divorce, and she sought to be named the primary residential parent.  In the proposed permanent parenting plan she attached to her complaint, Mother sought to have parenting time with the children for 285 days per year and proposed Father have parenting time with the children for 80 days per year.

Father filed an answer and counter complaint for divorce.  Father also alleged irreconcilable differences as grounds for divorce, and he, too, sought to be named the primary residential parent.  In his proposed permanent parenting plan, Father sought to have the children for 275 days of the year and for Mother to have the children for 90 days each year.

The trial court held a two-day hearing in May 2014.  Both Mother and Father testified and indicated their desire to be the primary residential parent.  At the time of the trial, Mother was working in Gallatin, which was over an hour's drive from her home in Dickson.  Mother testified that Charlie was experiencing some trouble in school and needed to meet with a therapist during the week after school.  Mother's employer in Gallatin was not flexible with her hours and did not want Mother to leave during the day to take Charlie to his therapy sessions.  Mother testified that she had turned in her notice and was resigning from her job once the trial was over so that she could work closer to home and be there more for her children.  According to Mother, Father did not believe Charlie needed to attend therapy sessions, and she did not think she could depend on Father to drive Charlie to the therapist's office on a regular basis.

Mother was earning $18.40 an hour at her job in Gallatin.  Once the trial was finished, Mother was planning to begin working for her father, who owns a company that installs windows and doors.  Mother testified that she will earn $10 an hour working for her father and that she will have flexible hours.

During her testimony, Mother raised a concern she had about Father's inability, due to his work schedule, to care for the children without help from his mother.  Father is a firefighter and has the typical firefighter's schedule of working 24 hours straight, followed by 48 hours off.  Mother testified that when Father has the children, he needs help from his mother to care for the children due to his work schedule.  Father confirmed this during his testimony:

2

Q:      Let's say today was your day to be on the 24 hour shift.  You go in at seven  o'clock, you have to be there at 7:00, correct?

A:      Yes, sir.

Q:      That means that you are going to have to find a way to get your children to school before you go to work in Dickson from where you live, and I believe you live in Pegram?

A:      Yes, sir.

. . . .

Q:      So you're going to have to find somebody to get your children to school on the days that you work, correct?

A:      Yes, sir.

Q:      And that would be your mother, if I understand correctly?

A:      Yes sir.  That way I don't have to send them to daycare.

. . . .

Q:      What time do you leave?

A:      6:15, 6:30, somewhere.

Q:      So from 6:15 in the morning when you leave your house then you are going to be gone for the next 24 hours.  And then you would return, you would get off of work at 7:00 the next morning, unless you catch a call. And that means that by the time you get back to your home it's going to be time for your kids to have already been at school, correct?

A:      Yes, sir, that's correct.

Father testified that when he is at work he has no objection to Mother's having the children with her.  However, Mother claimed that Father did not offer her the opportunity to have the children while he was at work.

3

Mother testified that if she were named the primary residential parent, she would not need help from anyone else to care for the children. During her testimony, Mother's attorney asked whether she would be willing to work with Father to allow him to see the children during his time off work if she were named the primary residential parent:

Q: [I]f you have the children on a full time basis, what sort of a schedule do you believe they should have with their father?

A: Any available dates really that he's off work, not on-call going to the Fire Department, and - - I have no problem with him giving me his schedule. As to working our two schedules together, if he is off at the Fire Department, he has 48 hours off, that's two to three times a week, then I don't have an issue with that.

Father testified that he likes to be in control, and he admitted during the trial that he has lost his temper and has caused damage to different parts of the house as a result of hitting or punching. He also testified that he has used a handmade wooden paddle to discipline the children. In February of 2011, Father was charged with domestic assault as a result of an incident involving Mother, Father, and their daughter. Rorie was engaging in inappropriate behavior when she was about four years old, and Father lost his temper while he was disciplining her. Mother testified as follows:

Q: How many times did he say [during his deposition that] he had whipped [Rorie]?

A: Between 10 and 15 times.

Q: Now, what did you observe personally at that time?

A: I personally observed, when I came around the corner after hearing everything, I watched Ryan pick [Rorie] up by her shoulders and walk her through Charlie's bedroom . . . into the hallway. . . . As I walk into Rorie's room Ryan is sitting in front of her knelt down holding her shoulders going, what the F., what the F. are you doing, and smacks her on the leg two or three more times. At that point I had had enough.

Q: What was Rorie doing?

A: Screaming and crying bloody murder.

4

Q: What did you do when you saw that?

A: I immediately grabbed [Ryan] and moved him away, just like get out of the way, and I'm right there at Rorie. I'm trying to get Rorie. He starts screaming and yelling at me, just hit me. Ryan, I don't want to hit you. You just need to leave. No, hit me. You know you want to hit me. No, I don't, Ryan. I'm done fighting with you, I want you to leave this house now. And when I was saying that I had my hand in his face . . . .

At that time he grabs my wrist. Of course my first instinct, because of everything in the past, is to grab his. Well, as my arm is coming back across he grabs my other arm and jerks my arm straight up. And from there it's back and forth. He's throwing me around. I did hit him in the mouth as well as him hitting me in the eye. After him tossing me around for a few minutes, I was able to get away. Made it back to the rec room where I had left the phone . . . . I grabbed that phone and called 911.

Q: Okay. And then is that what - - is that the incident that led to a charge being brought against Mr. Roland?

A: Yes.

Q: What was he charged with?

A: Domestic assault.

Father testified that he attended anger management and parenting classes after being charged with domestic assault and that these classes were a prerequisite of a plea bargain agreement to avoid being prosecuted for the domestic assault charge. Father also testified that he has learned to control his anger as a result of participating in these classes.

TRIAL COURT'S JUDGMENT

The trial court took the matter under advisement and issued a memorandum opinion in August 2014. The court summarized the evidence presented during the trial and made the following findings of fact, *inter alia*:

[Mother] testified that [Father] has a hot temper and "doesn't handle stress very well." He punches inanimate objects. He has broken things in

5

front of the children. [Father] once pushed [Mother] in front of the children. [Father] has used "the 'F' word" in front of the children.

. . . .

In the third grade, Charlie started "having issues." He was acting timid. In the fourth grade, the school officials reported that Charlie was having problems with his peers. He switched classes but the problems continued.

[Mother] testified that she helped Charlie with his homework.

After the divorce was filed, [Mother] took the children out of Pegram School and moved to Yellow Creek in Dickson County. She placed the children in Dickson County Schools. After this Court issued a temporary restraining order, [Mother] moved the children back to school in Pegram. [Mother] wants to place the children in the Dickson County School System.

[Father]'s parents keep the children when [Father] is working. . . .

. . . .

On cross-examination, [Mother] testified that, after the separation, she lived in a travel trailer in White Bluff; then rented a house in Kingston Springs; then rented a house on Yellow Creek where she now lives.

. . . .

[Mother] testified that she resigned from her job in Gallatin because she couldn't parent the children and work the hours that were being required of her. She has no idea how she will pay her bills after her job in Gallatin terminates. She testified, "If I need more money, I'll work more. My dad will let me work more if I need to."

. . . .

[Mother] testified that she received eight hundred twenty-four ($824) dollars per month from SSI for Charlie because his biological father was killed before he was born. She has never shared this money with [Father] even though [Father] keeps Charlie half the time.

6

. . . .

On a number of occasions, [Father] has had to catch Charlie up on school work that should have been done while he was with [Mother].

. . . .

Mr. Roland [Father's father] testified that the parties' marriage started out well but went downhill. The parties had temperament issues. Mr. Roland saw [Mother] slap [Father] hard. [Mother] verbally abused [Father] in front of several other people. Mr. Roland testified that, in his opinion, her actions were "totally unnecessary and out of place." Mr. Roland testified that [Mother] disciplines the children excessively.

. . . .

On cross-examination, Mr. Roland was evasive when asked about [Father]'s temper.

The trial court then turned to the issue of the children's custody and which parent should be the primary residential parent. In its discussion of this issue, the court wrote, in pertinent part:

[Mother] now works about twenty (20) plus hours per week in Dickson. She lives in Dickson County in a rented three bedroom house. Her work hours are flexible.

[Father] works twenty-four (24) hours on and forty-eight (48) hours off in Dickson. He lives in Pegram in his grandmother's house. [Father]'s father and step-mother live nearby and help care for the children, especially when [Father] is working.

[Mother] testified that she was agreeable that [Father] have the children during the forty-eight (48) hours that he was not working. [Father] testified that he was agreeable that [Mother] have the children during the twenty-four (24) hours that he was working.

Prior to the separation, [Mother] was the primary caregiver for the children. [Father] worked long hours at that time. After the separation, the parties have had the children on alternating weeks.

7

Prior to the separation, [Father] was subject to fits of temper. The proof establishes that [Mother] had a problem with her temper as well. The proof establishes that, since the separation, [Father] has taken anger management classes and now is able to control his temper. [Father] has taken parenting classes as well.

During the separation, [Mother] has exhibited very poor judgment where the children are concerned. For example, she spent the night on several occasions with a man to whom she was not married and allowed the children to stay overnight in the home as well. Also, [Mother] allowed the children's school lunch accounts to accumulate a two hundred ($200) dollar arrears over a dispute [with [Father]]. While the children were not denied lunch, this was extremely unwise.

Although [Mother] testified that she helped Charlie with his homework, on several occasions Charlie has come to [Father]'s house after a week with [Mother] with homework undone.

Charlie is allergic to dogs and cigarette smoke. [Mother] smokes, has a dog and seeks to work with dogs at her house. [Father] does not smoke.

Given the facts of the case, this Court finds that it is in the best interest of the children that [Father] be the primary residential parent. The children will reside with [Father] during the forty-eight (48) hours that [Father] is off from work and with [Mother] during the twenty-four (24) hours that [Father] is working. [Father] will make decisions relating to the children after consultation with [Mother].

In the residential parenting schedule the trial court attached to its final decree, the court described the day-to-day schedule as follows: "The Father shall have the children during his forty-eight (48) hours off from work and the Mother shall have the children while the Father is working his twenty-four (24) hour shift." The court wrote that the day to day schedule would apply to all holidays and other school-free days, including fall vacation, winter (Christmas) vacation, and spring vacation. The court awarded each party one continuous week with the children during the summer vacation, assuming each party gave at least two months' written notice of their intended time.

8

Mother appeals the trial court's judgment and argues the court erred in the following ways: (1) designating Father as the primary residential parent; (2) setting up the residential schedule and parenting plan; and (3) calculating Mother's child support obligation. We will address each issue Mother raises in the order in which she raises them. Father seeks an award of the attorney's fees he has incurred on appeal.

ANALYSIS

1. Primary Residential Parent Determination

When a court is faced with a proceeding in which a child's residential arrangements must be determined, whether the proceeding is a divorce or otherwise, a court must incorporate a permanent parenting plan into its final decree that includes a residential schedule for the children. Tenn. Code Ann. § 36-6-404. The court's "custody determination" must be based on the children's "best interest." Tenn. Code Ann. § 36-6-106(a). Tennessee Code Annotated section 36-6-106 was amended in July 2014. 2014 TENN. PUB. ACTS, ch. 617, § 4. The version of Tenn. Code Ann. § 36-6-106 that was in effect at the time of these proceedings directed the court to allow each parent "to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)-(10), the location of the residences of the parents, the child's need for stability, and all other relevant factors." Tenn. Code Ann. § 36-6-106 (2012); *see* Tenn. Code Ann. § 36-6-401(a) ("The general assembly recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests.").

Our review of the trial court's findings of fact is de novo, with a presumption that the findings are correct unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002). We review issues of law de novo, giving no presumption of correctness to the trial court's conclusions. *Armbrister*, 414 S.W.3d at 692; *Kendrick*, 90 S.W.3d at 569-70. Trial courts have "broad discretion" to fashion parenting plans, as the Tennessee Supreme Court has explained:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 230 S.W.2d 1003, 1006 (Tenn. 1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate

9

the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)).

*Armbrister*, 414 S.W.3d at 693. As the Court of Appeals has written,

> Because custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during proceedings, appellate courts are reluctant to second-guess a trial court's decisions. Accordingly, appellate courts review a trial court's decision regarding which parent to name as the primary residential parent for an abuse of discretion. A trial court's decision regarding custody or visitation should be set aside only when it falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. Thus, it is not within the province of appellate courts to tweak a parenting plan in hopes of achieving a better result than the trial court.

*Aragon v. Aragon*, No. M2013-01962-COA-R3-CV, 2014 WL 1607350, at *4 (Tenn. Ct. App. Apr. 21, 2014) (quotations and citations omitted).

The Tennessee Supreme Court recently explained that when reviewing a trial court's exercise of discretion, the appellate court is to "presume that the trial court's decision is correct and review the evidence in a light most favorable to upholding the decision." *White v. Beeks*, __ S.W.3d __, 2015 WL 2375458, at *7 (Tenn. May 18, 2015) (citing *Lovlace v. Copley*, 418 S.W.3d 1, 16-17 (Tenn. 2013) (itself quoting *Gonsewski*, 350 S.W.3d at 105)). An appellate court will not find that a trial court has abused its discretion unless the trial court's parenting arrangements "'fall[ ] outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge v. Eldridge*, 42 S.W.2d 82, 88 (Tenn. 2001)).

The version of Tenn. Code Ann. § 36-6-106 that was in effect at the time of these proceedings directed the courts to consider the following factors in determining the children's best interest:

> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;

10

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Tenn. Code Ann. § 36-6-106(a).

Mother contends that the trial court failed to state its conclusions of law based upon its findings of facts and that the trial court did not apply the correct legal standards to the evidence contained in the record. We disagree. The trial court set out very detailed findings of fact in its memorandum opinion, many of which relate to the factors set forth in Tenn. Code Ann. § 36-6-106(a) that courts are supposed to consider in determining a child's best interest. The court then concluded, based on its factual findings, that "it is in the best interests of the children that [Father] be the primary residential parent."

As the courts have noted, "The 'best interests' analysis is broad and subjective. It does not employ hard and fast rules and is largely fact-dependent." *Yeager v. Yeager*, No. 90D-2743, 1995 WL 422470, at *4 (Tenn. Ct. App. July 19, 1995) (citing *Taylor v. Taylor*, 849 S.W.2d 319, 327 (Tenn. 1993)); *see Aragon*, 2014 WL 1607350, at *9 ("[A] custody determination on behalf of a child is a 'fact-intensive issue' that requires detailed findings of fact and conclusions of law by the trial court."). When a court conducts a best interest analysis to determine which parent should be designated the primary residential parent, the court engages in a "'comparative fitness' analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other." *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (citing *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. 1983)); *accord Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996); *Ward v. Ward*, No. M2012-01184-COA-R3-CV, 2013 WL 3198157, at *16 (Tenn. Ct. App. June 20, 2013). According to the *Ward* court,

Fitness for custodial responsibilities is largely a comparative matter. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others.

12

*Ward*, 2013 WL 3198157, at *16 (quoting *Bah*, 668 S.W.2d at 665-66) (further citation omitted). The court must take into consideration all of the evidence and circumstances of the parties when determining which parent should be named a child's primary residential parent. *Chaffin*, 211 S.W.3d at 286.

Courts are required to consider each of the factors enumerated in Tenn. Code Ann. § 36-6-106(a), but they are not required to list each factor and explain how each factor impacts its ultimate determination, as Mother suggests. *Woods v. Tidwell*, 2011 WL 1662900, at *4 (Tenn. Ct. App. May 3, 2011); *Murray v. Murray*, No. M2009-01972-COA-R3-CV, M2009-01576-COA-R3-CV, 2010 WL 3852218, at *8 (Tenn. Ct. App. Sept. 28, 2010). Keeping in mind the factors set forth in Tenn. Code Ann. § 36-6-106(a), the evidence introduced at trial showed that both Mother and Father care deeply for the children and that each values their time with them. Both Mother and Father appear capable of providing the children with food, clothing, medical care, education, and other necessary care. However, when Father's counsel asked Mother how she intends to pay her rent and other expenses once her income drops as a result of her change in jobs, Mother did not have an answer. The evidence suggested Father was more stable financially than Mother at the time of trial.

Mother has moved at least twice since she moved out of the family house in 2011, whereas Father has continued to remain in the same house. Thus, Father has provided more continuity in the children's day-to-day living situation. The trial court found Father has suffered from "fits of temper," which finding is supported by the evidence. However, Father has participated in anger management classes as well as parenting classes, and Father testified that he has learned to control his anger as a result of these classes. No evidence was introduced suggesting Mother or Father suffers from any mental or physical illness.

The record shows that Charlie has faced some challenges in school and with his peers. Mother testified that she was willing to take Charlie to therapy sessions to help him work through the challenges, whereas Father did not believe the therapy was necessary. On the other hand, evidence was introduced that Charlie did not always get his homework done while he was with Mother, and that Father has had to help Charlie catch up on his missed homework when Charlie has gone to his house after being with Mother.[1]

Considering the trial court's findings of fact along with the other evidence introduced at trial, we find the factors set out in Tenn. Code Ann. § 36-6-106(a) slightly favor Father.

---

[1] Mother testified that she did not always know what Charlie's homework was and that the teachers did not communicate with her as well as they did with Father.

13

Thus, the trial court's designation of Father as the children's primary residential parent is within "the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Armbrister*, 414 S.W.3d at 693. Accordingly, we do not believe the trial court abused its discretion in naming Father the primary residential parent, and we affirm that portion of the trial court's judgment.

 2. Residential Schedule and Parenting Plan

Turning to the residential schedule and parenting plan the trial court imposed, Mother asserts the plan is illogical and is based on an erroneous assessment of the evidence. In its discussion of an appellate court's review of a trial court's residential parenting plan, the Tennessee Supreme Court has written:

> "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id*. "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).

*Armbrister*, 414 S.W.3d at 693.

The trial court incorporated a permanent parenting plan into its final decree of divorce that awards Mother 120 days with the children and Father 265 days. The number of days the court awarded Mother is not objectionable, but the residential schedule is unorthodox and problematic because it is based entirely on Father's work schedule and has no regularity to it. Mother is supposed to have the children with her for 24 hours while Father is working at the fire department, and then Father is to have the children with him for the following 48 hours, when he is off duty. The court did not specify which days of which week Mother would have the children, nor did the court specify where the children would spend their holidays or school vacations. In the section of its memorandum and order titled "Visitation," the court wrote:

> In view of the fact that [the] "shared custody" arrangement allows [Mother] approximately one hundred twenty (120) days per month [sic], the visitation will be included in that amount. Since [Mother] will have one day in three, she should have time with the children sufficiently proximate to any

14

holiday. Each will have one week in the summer vacation from school upon two month's [sic] written notice.

In arriving at this schedule, the trial court seemed to rely heavily upon, and to misinterpret, Mother's testimony regarding her willingness to accommodate Father's work schedule. During Mother's testimony, her attorney asked whether Mother would be flexible in allowing Father to see the children when he was not working, if Mother "ha[d] the children on a full time basis." Mother acknowledged Father's unconventional work schedule of working 24 hours in a row, followed by having 48 hours off at the fire department where he was employed. Mother displayed her willingness to accommodate Father's unusual work schedule when she responded:

Any available dates really that he's off work, not on-call going to the Fire Department, and - - I have no problem with him giving me his schedule. As to working our two schedules together, if he is off at the Fire Department, he has 48 hours off, that's two to three times a week, then I don't have an issue with that.

The trial court took Mother's testimony out of context and interpreted her testimony to mean that she was willing to let Father have the children for every 48-hour period Father was scheduled to be off duty. The court failed to take into account the underlying premise of Mother's response, which was that she would be the primary residential parent. Mother testified that if she had the children "full time," as the primary residential parent, she would be flexible and would work with Father to make sure he was able to have the children with him during his time away from work. Mother did not testify that she was willing for Father to have the children for each 48-hour period he was off duty.

The children are currently eight and eleven years old. The trial court's residential schedule has the children changing residences multiple times each week, without regard to school days, weekends, holidays, or summer vacations. There is absolutely no consistency from week to week. Although Mother is awarded the children for one-third of the year, she has no continuity with the children for more than twenty-four hours at a time other than in the summer, when the court awarded each parent one week with the children, conditioned upon two months' written notice. As Mother aptly notes, "this schedule basically relegates Mother to the position of 'babysitter' for the children while Father is working and gives her very little meaningful opportunity to parent her children, even as an alternate residential parent." The trial court's schedule is based on an erroneous assessment of Mother's testimony, and constitutes an abuse of the trial court's discretion. *See Gonsewski*, 350 S.W.3d at 105 (noting that a court abuses its discretion by reaching illogical decision or resolving issue on erroneous assessment of evidence).

15

Tennessee courts provide forms for parents to fill out and file with the court as a proposed parenting schedule. These forms direct each parent to indicate their preferred day-to-day schedule every week, or every other week, as well as where the children should spend each holiday and other school-free days of the year. Mother filed a proposed permanent parenting plan with the court when she filed her complaint for divorce, and Father filed a proposed permanent parenting plan with the court when he filed his answer and counter complaint for divorce. The trial court disregarded each party's proposed schedule to arrive at its own arrangement.

As an appellate court, we are not in a position to create a permanent parenting plan anew. Therefore, we remand this case to the trial court with directions to schedule a hearing for the purpose of setting up a new permanent parenting plan, with Father designated as the primary residential parent. The parenting plan should be based on the form provided by the courts, where the children have a regular schedule; the children are scheduled to spend holidays with one parent or the other, on a regular, alternating basis from year to year; the parents split the time they have with the children during the December/January school break; and where the parents have the opportunity to spend one-half of each summer vacation with the children.

Father testified at trial that his mother often helps him care for the children when he has to leave for work early in the mornings and the children are at his house. Father's mother has fed the children, driven them to and home from school, and stayed overnight with them when Father is unavailable. This arrangement may deprive Mother of time she could have with the children. In this particular circumstance, this arrangement may not comply with the statutory directive that courts are to "order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)-(10) . . . ." Tenn. Code Ann. § 36-6-106(a). Thus, the court should consider whether the parenting plan should specify that if Mother or Father has a conflict during her or his parenting time such that she or he is unavailable to care for the children or drive them where they need to be, that parent shall inform the other parent in a timely manner and give the other parent the right of first refusal to be with or provide for the children.[2]

---

[2]On remand, the trial court should also address any issues the parties allege were not covered by the parenting plan attached to the trial court's final decree, including but not limited to whether either party is required to carry life insurance, which party is to receive the tax exemption for the children, and which party is responsible for any uncovered health and dental expenses.

3. Child Support

The trial court addressed the issue of child support in its memorandum and order. First, it ordered Father to provide medical insurance for the children and indicated that "the amount of child support will be increased by the amount attributable to the children." The court then determined the income amounts to attribute to each party so that it could calculate the amount of child support that Mother, as the alternate residential parent, was obligated to pay Father, as the primary residential parent. *See* TENN. COMP. R. & REGS. 1240-2-4-.08 (providing overview of child support calculations); *Hopkins v. Hopkins*, 152 S.W.3d 447, 450 (Tenn. 2004) (according to child support guidelines, child support may be awarded only to primary residential parent).

We review a trial court's child support decision under an abuse of discretion standard, as explained by the Court of Appeals in *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244 (Tenn. Ct. App. 2000):

> Setting child support is a discretionary matter. Accordingly, we review child support decisions using the deferential "abuse of discretion" standard of review. This standard requires us to consider (1) whether the decision has a sufficient evidentiary foundation, (2) whether the court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives. While we will set aside a discretionary decision if it rests on an inadequate evidentiary foundation or if it is contrary to the governing law, we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative.

*Id*. at 248 (citations omitted).

The trial court gave Father a credit of $401.58 in the child support worksheet on line 8a, which is labeled "children's portion of health insurance premium." As Mother points out, however, the record contains no evidence of the cost to Father of providing insurance for the children. Mother does not object to Father's receiving a credit equal to the cost of providing the children with medical insurance, but she does object to the court's decision to credit Father with an amount that is not supported by the evidence. Thus, we vacate the $401.58 credit awarded to Father and remand this issue for further proceedings to allow Father to present evidence of his cost, if any, to add the children to his insurance policy. *See Smith v. Smith*, No. M2008-01589-COA-R3-CV, 2009 WL 2868745, at *5 (Tenn. Ct. App. Sept. 2, 2009) (explaining that evidence in record must provide basis for expenses included in child support worksheet); *Amos v. Amos*, No. 01-A-019504CH00156, 1992 WL 247644, at *4 (Tenn. Ct. App. Oct. 2, 1992) (denying father credit for insurance in absence of evidence of

17

its value).

The final issue Mother raises concerns the level of income the trial court attributed to her for purposes of determining the proper amount of child support to award. The trial court set Father's income at $2573 per month and set Mother's income at $3611 per month. Mother argues the trial court erred in attributing a higher income to her than the evidence warrants.[3] Evidence was introduced that prior to trial, Mother was earning $18.40 an hour at her job in Gallatin. Mother testified, however, that she had resigned from that job and that she was going to begin working for her father following the trial and would earn $10 per hour. Consistent with Mother's testimony, the trial court found that Mother had resigned from her job in Gallatin and was working approximately twenty hours per week for her father, making $10 per hour. Nevertheless, the court then wrote: "It also finds that [Mother] is capable of making substantially more than she is currently earning . . . ."

Mother argues that in attributing a level of income to her that she was not, in fact, earning, the trial court found she was underemployed, and that this was erroneous. The Tennessee child support guidelines specify that additional gross income can be imputed to a parent in the following circumstances: (1) if a tribunal determines the parent is "willfully and/or voluntarily underemployed"; (2) if there is no reliable evidence of the parent's income; or (3) if the parent owns a substantial amount of non-income producing assets. TENN. COMP. R. & REGS. 1240-2-4-.04(3)(a)(2)(i). "The Guidelines do not presume that any parent is willfully and/or voluntarily under or unemployed." TENN. COMP. R. & REGS. 1240-2-4-.04(3)(a)(2)(ii).

Father does not dispute that Mother has resigned from her job in Gallatin, that she was going to start working for her father for about twenty hours per week, or that she would earn $10 per hour. Mother's father testified and confirmed the arrangement he has made to employ Mother. Thus, there was reliable evidence of Mother's income.[4] The trial court implicitly found that Mother was underemployed when it attributed a higher level of income to her for child support purposes. However, Mother testified that she felt she had no choice but to leave her job in Gallatin because Gallatin was too far from her children, and she believed she needed to be available to drive Charlie to therapist sessions in the afternoons following school. Mother testified that her employer did not give her the flexibility she needed to leave during the afternoons to drive her children where they needed to be. The Court of Appeals has explained that "'[i]f a parent's reasons for working in a lower paying

---

[3]The record does not indicate how the trial court arrived at the $3611 figure. Mother did not testify that she earned that amount per month.

[4]No evidence was introduced that Mother has substantial non-income producing assets to justify imputing additional income to her.

18

job are reasonable and in good faith, the court will not find him or her to be willfully and voluntarily underemployed.'" *Miller v. Welch*, 340 S.W.3d 708, 712 (Tenn. Ct. App. 2010) (quoting *Pace v. Pace*, No. M2009-01037-COA-R3-CV, 2010 WL 1687740 (Tenn. Ct. App. Apr. 26, 2010) (itself quoting *Owensby v. Davis*, No. M2007-01262-COA-R3-JV, 2008 WL 3069777, at *4, n.7 (Tenn. Ct. App. July 31, 2008))). A trial court's finding of willful underemployment "'must result from an intent on the part of the parent to reduce or terminate his or her income.'" *Id.* (quoting Pace, 2010 WL 1687740, at *8 (itself quoting *Wilson v. Wilson*, 43 S.W.3d 495, 497 (Tenn. Ct. App. 2000))).

No evidence was introduced regarding Mother's educational background beyond high school or suggesting Mother has particular skills she is intentionally not utilizing to earn a higher wage. Moreover, there was no evidence that Mother chose to work for a lower wage in order to reduce or terminate her income. Based on the evidence that Mother resigned from a higher paying job for no reason other than to be closer to her children and to be a better mother, we conclude the trial court's decision to impute additional income to Mother lacked an evidentiary basis and constituted an abuse of the court's discretion. Accordingly, we vacate the trial court's child support order and remand this issue to the trial court for further proceedings.

On remand, the trial court shall determine the proper amount of child support to award based on the evidence and child support guidelines. It shall also receive evidence of the cost to Father of providing medical insurance for the children, if any, and shall give Father the appropriate credit, if a credit is warranted.[5]

### 4. Attorney's Fees

Father seeks an award of the attorney's fees he incurred on appeal. A court has discretion to award attorney's fees to a party who prevails in an action to enforce a decree for child support or to defend an adjudication of custody. Tenn. Code Ann. § 36-5-103(c); *RCK Joint Venture v. Garrison Cove Homeowners Ass'n*, No. M2013-00630-COA-R3-CV, 2014 WL 1632147, at *4 n.5 (Tenn. Ct. App. Apr. 22, 2014); *Perez v. Kornberg*, No. M2004-01909-COA-R3-CV, 2006 WL 1540254, at *17 (Tenn. Ct. App. June 5, 2006). Father is not the prevailing party in this case, however, because he prevailed on only one issue on appeal.

---

[5]Mother also argues the trial court erred by failing to reduce her child support obligation by the amount of money Charlie receives each month as a death benefit from the Social Security Administration following the death of his biological father. Mother relies on Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(5)(i), but that section only applies to federal benefits that "spring from the parent's account." The death benefit Charlie receives springs from the account of Charlie's deceased father, not the account of Mother; therefore, that section of the child support guidelines is not applicable either to augment or decrease Mother's child support obligation.

We, therefore, deny his request for an award of fees.

CONCLUSION

For the reasons stated above, we affirm the trial court's designation of Father as the children's primary residential parent. We vacate the trial court's judgment with respect to the other issues considered herein and remand the case to the trial court for further proceedings consistent with this opinion. The trial court shall schedule a hearing and (1) devise a permanent residential schedule and parenting plan in accordance with the directions set forth herein; and (2) determine the amount of child support to award based on the number of days each party has the children, taking into account the parties' current income levels and credits for expenses, if any. The costs of this appeal shall be split equally between the parties, for which execution shall issue, if necessary.

_____
ANDY D. BENNETT, JUDGE